IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RENA LEE BJORGE,

                        Plaintiff,                                  OPINION AND ORDER

     v.

                                                                    23-cv-004-wmc

MARTIN O'MALLEY, Commissioner of
Social Security,[1]

                        Defendant.

Plaintiff Rena Lee Bjorge seeks judicial review under 42 U.S.C. § 405(g) of a final determination that she was not disabled within the meaning of the Social Security Act and, therefore, ineligible for benefits. (Dkt. #1, at 1-2.) An administrative law judge ("ALJ") reached that conclusion on August 1, 2022, which the appeals council affirmed on October 31, 2022. (*Id.* at 1.) Plaintiff asks this court to reverse and remand the adverse determination, while the defendant Commissioner of the Social Security Administration (the "Commissioner") moves for summary judgment in his favor. (Dkt. #8, #16.) Although plaintiff raises several grounds for remand, the court is persuaded that the ALJ's apparent failure to weigh evidence of her chronic migraines as a severe impairment in concluding that she could consistently perform light work is sufficient by itself to warrant remand. Therefore, the court will grant plaintiff's request and deny the Commissioner's motion for summary judgment.

---

[1] Consistent with this court's ordinary practice, it has substituted the name of Kilolo Kijakazi for that of the current Commissioner, Martin O'Malley, pursuant to Fed. R. Civ. P. 25(d).

BACKGROUND[2]

A. **Procedural History**

Ms. Bjorge was injured in 2004, when her car was struck in the driver's side door by another car going 60 miles per hour, as a result of which she suffered whiplash and developed chronic migraine headaches. (AR 569). On September 9, 2020, plaintiff filed an application for social security disability benefits, alleging that she had not been able to work since September 2, 2019, due to frequent, severe migraines and lingering neck problems associated with the 2004 accident. (AR 17, 104.)

In her application for disability benefits, Bjorge reported that she was unable to get out of bed on most days, much less work because she was in too much pain. (AR 311, 356.) Bjorge explained that she suffered persistent migraines as many as 20 to 30 days per month, causing serious pain in her head made worse by her sensitivity to light when opening her eyes. (AR 311.) She reports further that noise made her head hurt even more and that she suffered from nausea, vomiting, and brain fog both during and after each migraine, rendering her unable to think clearly. (*Id*.) During these migraines, Bjorge described having memory issues, difficulty concentrating or following instructions, and an inability to complete tasks due to the pain and sickness she experienced. (AR 319.) She also described the pain as "excruciating" and, once a migraine started, that it was usually unstoppable, even with medications. (AR 356.) As a result, during these episodes, she was forced to isolate in a dark room with little or no noise until the pain abated. (*Id*.)

---

[2] The facts set forth in this section are taken from the parties' submissions and, where indicated, from the administrative record ("AR") at dkt. #5, which includes a transcript of the evidentiary hearing before the ALJ.

Nevertheless, Bjorge was found "not disabled" during the initial review of her application on April 16, 2021, after a non-reviewing physician opined that her statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by objective medical evidence. (AR 101, 110.) On January 3, 2022, Bjorge was also found not disabled on reconsideration (AR 122), after a reviewing physician (Larry Xanthopoulos, MD) noted that she had "normal exams" (AR 128), and a psychological consultant (John Warren, Ed.D) concluded that she could sustain the mental demands associated with carrying out simple tasks over the course of a routine workday or workweek within acceptable attention, persistence, and pace tolerances. (AR 129.) Thereafter, Bjorge requested an evidentiary hearing before an ALJ. (AR 170.)

### B. Medical Evidence of Disability

To establish that she is "disabled" within the meaning of the Social Security Act, a claimant must demonstrate that she had a medically determinable physical or mental impairment expected to last at least twelve months rendering her unable to engage in substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A), (2)(A). In assessing disability, the Commissioner or his designee conducts a five-step inquiry including determinations as to: (1) whether the claimant is performing substantial gainful activity; (2) whether the claimant's impairments are severe; (3) whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of 20 CFR Part 404; (4) whether the claimant can perform her past relevant work based upon her residual functional capacity assessment or "RFC"; and (5) whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of

proof at every step, except the fifth inquiry, *Wilder v. Kijakazi*, 22 F.4th 664, 651 (7th Cir. 2022), and in particular, must produce objective medical evidence to corroborate her allegations of disabling symptoms. *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021); *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).

Bjorge submitted numerous medical records in support of her application for disability benefits, showing that she was diagnosed with chronic migraine, as well as migraine with aura, stemming from the car accident that occurred in 2004. (AR 419.)

> Migraines are vascular headaches involving throbbing and pulsating pain caused by the activation of nerve fibers that reside within the wall of brain blood vessels traveling within the meninges (the three membranes covering the brain and spinal cord). There are two major types of migraine: Migraine with aura and migraine without aura. Migraine with aura is accompanied by visual, sensory, or other central nervous system symptoms. Migraine without aura is accompanied by nausea, vomiting, or photophobia (light sensitivity) and phonophobia (sound sensitivity). Migraine without aura is the most common form of migraine.

SSR 19-4p, § 1 2019 WL 4169635, at * 3 (Aug. 26, 2019).

At a medical appointment to discuss her migraines in April 2019, Bjorge noted that despite taking Imitrex, she currently had a migraine so severe it caused her to vomit upon awakening due to head pain. (AR 447.) The physician then suggested dietary changes, as well as additional medication (Topamax). (AR 450.) As part of her treatment plan, Bjorge was also advised to lie down in a quiet, dark room whenever a migraine occurred to alleviate her pain. (*Id.*)

Over the next few months, Bjorge reported feeling better with Topamax. (AR 454-55, 458, 563, 469-70.) The frequency of her migraines slowed in frequency from 20 to 10 per month with a reduction in severity, but she still reported having "knock out" migraines. (AR 463.) She returned to see her physician in February 2020, and reported that she was

4

again having migraines every day, even while taking both Imitrex and Topamax. (AR 476.) She also reported having "word finding difficulty" and felt like her memory was "off." (AR 477.)

The following month, in March 2020, Bjorge reported that her migraines had "backed off a bit" to the point that she "[didn't] vomit as much," but she was still getting migraines 25 to 30 days per month. (AR 482.) Although she described herself as "pretty active" despite her pain, she stated that the migraines had made it hard for her to keep a job because she often had to go home sick or in pain. (AR 484.) In addition, Bjorge reported that she was trying to attend school for business management, but that she had missed "significant school time" due to her condition. (AR 485.)

Further, Bjorge started a program of weekly physical therapy with home exercise, but reported at her next appointment on March 17, 2020, that she had a "bad migraine" and was vomiting after the last session. (AR 491.) She also had a migraine the morning of the appointment, describing the pain as "9/10." (*Id*.)

At a neurology consultation later in March 2020, Bjorge reported a 20-year history of headaches dating back to her car accident. (AR 396.) Bjorge also volunteered that she self-medicated with alcohol for many years, but that she was currently sober. (*Id*.) Bjorge further reported that Imitrex no longer helped with her headaches, which caused nausea, vomiting, photophobia, and phonophobia, although she had started treatment with Topiramate (Topamax), twice a day, which was helpful but noted occasional word finding difficulties while on this medication. (*Id*.) The neurologist believed that Bjorge's headaches probably had a "mixed muscle migrainous component," and increased her dosage of Imitrex. (AR 397.) She also prescribed Gabapentin, suggested a regimen of

5

Botox, and physical therapy. (*Id.*) She also asked Bjorge to track her migraines. (*Id.*)

At a follow-up appointment in June 2020, Bjorge reported doing worse after physical therapy and that her headaches were increasing. (AR 401.) Due to the increased headaches, she was next prescribed a "burst" of methylprednisolone, which reportedly helped initially but also did not last long. (*Id.*)

During another neurology appointment in July 2020, Bjorge reported having severe migraine flare-ups lasting up to four hours at least five days a week, accompanied by light sensitivity, noise sensitivity, nausea, vomiting, dizziness, and loss of balance. (AR 418). Bjorge noted that she had quit many jobs before being fired due to migraines, and even with medications including Imitrex and Topamax, she needed to rest in a quiet, darkened bedroom and nap for 60 to 90 minutes to alleviate her pain. (*Id.*) Botox treatments also proved "difficult to tolerate" and had actually provoked migraines; while ultrasound therapy with physical therapy made her pain worse. (*Id.*) At a follow-up appointment in August 2020, Bjorge again reported having constant migraines. (AR 518.)

During a telephone encounter with a nurse on December 1, 2020, Bjorge repeated that Imitrex had helped "a little bit," but that she seemed to have developed a tolerance for this medication because it was not as effective as it had been in the past. (AR 608.) Bjorge further reported that it was now taking several days for her migraines to resolve. (*Id.*) The nurse also noted that Bjorge had tried and failed to manage her symptoms with several medications. (*Id.*)

At an appointment with her migraine specialist in late December 2020, Bjorge reported that she had contracted COVID-19 three months ago and was having even more migraine headaches. (AR 549.) Moreover, each flare-up now caused her to be non-

6

functional for three to four days. (*Id*.) Bjorge stated that she was spending "a lot of time in bed" and had to hide in her bedroom because she couldn't even handle the sound of Christmas presents being unwrapped. (*Id*.) Although she was able to graduate with her business degree, she was only able to do so because her instructor gave her extensions on assignments. (*Id*.) Her physician had also tried a prescription for injections of Emgality, which had not helped thus far. (AR 550) Even so, the physician elected to continue Emgality and recommended additional medications for abortive therapy to quiet the current streak of headaches. (AR 550-51.)

On March 26, 2021, Bjorge had a psychological evaluation with Dr. Frank J. Elmudesi to assess her mental functioning in connection with her application for disability benefits. (AR 559.) She reported having severe, chronic migraine headaches at least 20 times a month. (*Id*.) She further described them as debilitating to the extent that she could not focus or function on a day-to-day basis. (*Id*.) Elmudesi concluded that Bjorge suffered from a chronic, low-grade depressive disorder due to her history of medical-related issues. (AR 562.) He also concluded that Bjorge would have difficulty being able to perform job-related duties on a regular, full-time basis due to her "physical/medical symptoms." (AR 563.)

On March 29, 2021, Bjorge had a medical examination with Dr. Brian Allen in connection with her application for benefits. (AR 564.) During that appointment, she described having 20 to 30 migraine headaches a month, which varied in severity and duration. (*Id*.) She also reported that the headaches would get worse with exertion. (*Id*.) Still, Dr. Allen noted that an MRI of Bjorge's head was "unremarkable," and concluded

7

that she suffered from frequent migraine headaches and neck pain secondary to her whiplash injury, but offered no opinion on her ability to work. (*Id.*)

Bjorge saw her treating physician again in April 2021, and stated that she did not believe her headache frequency or severity had changed with Emgality. (AR 591.) She also reported using multiple abortive medications with "limited success." (*Id.*) At that point, her physician discontinued Emgality and substituted a medication called Ajovy, along with a trial of Ubrelvy to abort migraines. (AR 599.)

At a follow-up appointment in July 2021, her physician then assessed the effectiveness of the prescription for Ajovy, but Bjorge reported that it only had a "slight" reduction in severity with no decrease in the frequency of her headaches. (AR 568.) More specifically, Bjorge reported that she continued to have 20 to 30 headaches per month and that a prescription for an abortive remedy, Ubrelvy, was ineffective. (*Id.*) Bjorge continued to use Imitrex while resting in a quiet, dark room, along with a nap for 60 to 90 minutes to alleviate pain. (*Id.*) Sometimes she required a second dose of Imitrex after an hour. (*Id.*) Bjorge's physician noted that she was limited to 9 tabs of Imitrex per month and suggested a trial of two other preventative medications while continuing to take Ajovy. (AR 571.)

At an appointment with her physician in April 2022, Bjorge reported that she was seeing a benefit with Ajovy. (AR 653.) She also reported that her headaches and nausea were not as severe. (*Id.*) However, she continued to struggle with muscle pain and aches that trigger migraine symptoms. (*Id.*) She further complained of right arm pain, numbness, and tingling. (*Id.*) Bjorge reported further that she was "frequently" dropping objects with her right hand. (*Id.*)

8

C. Hearing Testimony

On May 19, 2022, ALJ Michael Schaefer held a hearing by telephone due to the COVID-19 pandemic. (AR 35.) Bjorge, who was 50 at the time of the hearing, testified that she had become unable to work because her severe migraines had become stronger and worse in 2019. (AR 60, 62.) She also reported that pain in her extremities had made her unable to make a fist or hold things. (AR 61.) She testified further that walking and lifting aggravated her spine and neck, which could cause an immediate migraine. (AR 64.) Whenever this occurred, Bjorge explained that she needed to lie flat and rest to get any relief. (AR 64-65.) She reported having migraines of varying severity – some lasting up to a week -- on an almost daily basis, with only "a couple of days a month" when she had a reprieve from persistent migraines, despite taking a variety of medications, making her sick on average one to three times a week. (AR 66, 67, 71.) Bjorge also told the ALJ that these migraines made her severely nauseous, causing her to "throw up until [she] dry heave[d]." (AR 67.) All she could do to feel better was to lie in bed with a cold pack and try different medications to see if they would work. (AR 68-69.)

Although unable to work in 2019, Bjorge acknowledged that she resumed a two-year associate's degree program for business management at a local technical college, which she had started in 2017, but had to drop out because she was "sick all the time." (AR 44.) Nevertheless, by returning to school, she was able "to keep food on the table" through school loans. (AR 63.) She finished the program in 2020, which at the time was taught virtually due to the COVID-19 pandemic, explaining further that she was only able to graduate because her instructor had accommodated her ailments by allowing her to turn in assignments late and to take tests in a small room by herself. (AR 43, 46.)

9

In response to a hypothetical RFC posed by the ALJ involving an ability to perform light work with a number of restrictions set forth below, a vocational expert testified that Bjorge would not be able to perform any of her past jobs, which included work as a meat cutter, a truck dispatcher, a food-prep worker, a quality control worker at a dairy, and a window assembler. (AR 73-74.) Based on the restrictions proposed by the ALJ's hypothetical, however, the vocational expert testified that someone with those limitations could perform light work as a mail clerk, routing clerk, maid or housekeeper. (AR 76.) In response to a second hypothetical about an individual being routinely absent from work for two days per month due to migraines, the vocational expert testified that this limitation "would preclude all work." (AR 79.)

### D. The ALJ's Decision

In a written opinion issued on August 1, 2022, the ALJ found that: Bjorge had not engaged in substantial gainful activity since the alleged onset of disability on September 2, 2019; and she had severe impairments for migraines, cervical spine dysfunction, depression with anxiety, and ADHD. (AR 17.) The ALJ found further that none of these impairments nor any combination thereof met or medically equaled the severity of a listed impairment found in 20 CFR Part 404, Subpart P, Appendix 1. (*Id*.) The ALJ next set forth the following RFC, allowing for light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), with additional restrictions given to the vocational expert at the hearing:

> She must avoid exposure to more than moderate levels of noise or light (defined as that degree of noise/light found in ordinary retail or office settings), as well as avoid even moderate exposure to workplace hazards (including moving machinery and unprotected heights). In addition, she can understand, remember, and carry out only simple instructions and routine

>    tasks in a work environment with few, if any, changes in the work duties or expectations. She is also limited to a work environment with no fast-paced production quota/rate (any production requirements should be more goal-oriented, such as based on a daily, weekly, or monthly quota).

(AR 24.)

Although "often bedridden" due to migraines that Bjorge reported suffering on an almost daily basis, the ALJ noted that the record indicated that she had experienced "improvement with recent treatment" with Ajovy. (AR 20-21.) The ALJ noted further that neurological examinations were "normal," and there was no "objective imaging" to substantiate Bjorge's claims. (AR 21.) He also noted that her completion of a business degree, her ability to live independently, and to perform "basic daily activities on her own" were all consistent with an ability to work within the assessed limitations. (AR 21-22.) He concluded, therefore, that "the objective medical evidence and other evidence . . . [did] not support limitations in functioning greater than assessed [in the RFC]." (AR 23).

While concluding that Bjorge could not perform any of her past relevant work (*id*.), the ALJ relied on testimony given by a vocational expert at the hearing in concluding that Bjorge would be able to perform a significant number of jobs within the national economy, including occupations such as mail clerk, routing clerk, and maid or housekeeper, all of which were considered unskilled, light-exertion jobs consistent with limitations found in the RFC. (AR 26.) For this reason, the ALJ submitted a finding of "not disabled." (*Id*.) After an appeals council concluded there was no basis for granting Bjorge's request for review, the ALJ's decision became the final decision of the Commissioner. (Dkt. #1-1, at 1.)

OPINION

A federal court's standard of review with respect to a final decision by the Commissioner of Social Security is well-settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's factual findings under § 405(g), the court cannot substitute its own judgment "by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). Indeed, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner or his designee's resolution of that conflict if it is supported by substantial evidence. *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017). At the same time, the court must review the record as a whole and ensure that the ALJ has articulated "a logical bridge" between the findings of fact and conclusions of law. *Stephens*, 888 F.3d at 327.

Here, Bjorge's primary argument is that the ALJ failed to draw a logical bridge between her myriad migraine symptoms and the RFC limitations, which failed to account for her frequent need to isolate and lie down in a quiet, dark room to alleviate her pain. (Dkt. #8, at 2, 6.) An ALJ has a duty to fully develop the record before drawing any conclusions and must adequately articulate his analysis so that the court can follow his reasoning on judicial review. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812-13 (7th Cir. 2011). Even if the court agrees with the ultimate

12

result, the case must be remanded if the ALJ fails to build that logical bridge between the facts and his conclusions. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

As outlined above, the record shows that Ms. Bjorge frequently complained of migraines of such severity that they caused her to vomit and left her bedridden for an entire day or more. (AR 311, 418, 447, 482, 491.) On occasions when a migraine would come on, part of her treatment consisted of lying down in a quiet, dark room for at least an hour to alleviate pain. (AR 450.) Because of her sensitivity to both light and noise, Bjorge further reported that she frequently needed to retreat to her quiet, dark bedroom and nap for 60 to 90 minutes in hopes that her medications would take effect. (AR 356, 418, 450, 568, 653, 658.) Even with medication, Bjorge also testified at the hearing that she was still suffering severe migraines at a frequency of at least one to three times per week; and all she could do to feel better was to lie in bed with a cold pack. (AR 66-69, 71.) Although the RFC included limitations on exposure to no more than moderate levels of light and noise, the ALJ defined that level of exposure as the "degree of noise/light found in ordinary retail or office settings[.]" (AR 6.) However, his written opinion makes no mention of Bjorge's need to lie down in a quiet, dark room to alleviate her frequent migraine pain; nor does he explain his reasons for disregarding this need, which was repeatedly documented in her medical records.

Once an ALJ finds that a claimant suffers a medically determinable severe impairment and the impairment produces a certain symptom, a claimant's testimony about the limiting effects of that symptom constitutes evidence that an ALJ must, at minimum, consider. *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011). Moreover, if Bjorge's own account about needing to remain in bed multiple days per week were credited, as her

treating physician seems to, the vocational expert conceded that she could not hold a full time job, raising a question about whether she met the criteria for disability. *Moon v. Colvin*, 763 F.3d 718, 723 (7th Cir. 2014); *see also Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("[N]o employer is likely to hire a person who must stop working and lie down two or three times a day for an hour at a time, or who requires multiple days to complete tasks other employees might finish in one work.").

Nevertheless, the ALJ did not even attempt to discredit Bjorge's testimony that she often needed to lie down and rest when experiencing a migraine. Where the ALJ's RFC limitations do not match the claimant's actual restrictions, remand is required. *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (remanding where "the ALJ did not really explain . . . why he did not believe [claimant's] testimony that he . . . had to lie down several times during the day to manage his pain"); *Meyer v. Colvin*, No. 14-cv-813-jdp, 2015 WL 7738394, at *2 (W.D. Wis. Dec. 1, 2015) (remanding a case so the ALJ could ensure that the claimant's migraine symptoms were "accurately matched to the limits in her RFC").

The Commissioner argues that the ALJ appropriately based the RFC on his assessment that Bjorge's condition had improved with injections of Ajovy, concluding that she was doing "pretty well." (AR 21.) However, this bare pronouncement cannot logically support the ALJ's RFC assessment without any discussion of the continuing frequency, duration, and disabling impact of Bjorge's migraine headaches despite the many medications she has tried, most of which had salutary benefits that diminished or went away with regular use. *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("The key is not whether one has improved (although that is important), but whether they have

improved enough to meet the legal criteria of not being classified as disabled."); *see also Kuczero v. Kijakazi*, No. 21-cv-246, 2022 WL 4545945, at *15-16 (N.D. Ind. Sept. 29, 2022) (remanding a case where the ALJ found that a claimant's migraines had "improved with medication" where the record showed that she continued to report daily headaches despite trying nine different medications for prevention and treatment of acute symptoms).

Further, the medical records that the ALJ points to in support of his conclusion actually show that Bjorge *continued* to have 20 to 30 migraine headaches per month even with medications. (AR 568.) In particular, although Bjorge's most recent treatment with Ajovy had produced a "slight reduction in severity," there was *no* reported change in the frequency of her migraines. (*Id*.) To the contrary, Bjorge reported during a follow-up medical appointment that she continued to suffer intense pain accompanied by an urge to lie down, as though she was going to pass out, even with Ajovy. (*Id*.) Thus, as Bjorge explained during the hearing, Ajovy merely made her frequent headaches less excruciating. (AR 71.)

In addition, although Bjorge commented during a rheumatology consultation that she was on a medication regimen that was "working pretty well" (AR 663), Bjorge also reported to her migraine specialist *and* to a treating neurologist around that same time that she continued to have frequent headaches despite treatment with Ajovy and continued to need to rest in a quiet, dark bedroom to alleviate her pain. (AR 653, 658.) Likewise, she testified at the hearing that her "reprieve" from migraine headaches was limited to "a couple of days a month." (AR 66.) The ALJ's failure to take into account that any improvement experienced by Bjorge was "slight," and more likely than not short-lived, casts further doubt on whether an adequate logical bridge existed between the RFC's

15

limitations and Bjorge's actual ability to work a full eight-hour day without frequently needing to lie down.

The Commissioner argues further that the ALJ properly crafted an RFC based on the lack of objective imaging to support Bjorge's symptoms. To the extent that the ALJ states that additional restrictions were not justified by objective imaging, this, too, would be error. The Seventh Circuit and other courts have recognized that objective testing is not used to confirm or rule out migraines, but to confirm or rule out *other* causes of headaches. *See Moon*, 763 F.3d at 721-22 ("Doctors use MRIs *to rule out other possible causes of headache* — such as a tumor — meaning that an unremarkable MRI is completely consistent with a migraine diagnosis.") (emphasis in original); *Cox v. Colvin*, No. 1:14-cv-01393, 2015 WL 5022907, at *6 (S.D. Ind. Aug. 24, 2015) ("[T]he fact that there is no objective medical evidence does little to support the ALJ's finding, as courts have recognized diagnostic testing cannot necessarily reveal the frequency or severity of migraines.") (citations omitted); *Washington v. Colvin*, No. 12C4995, 2013 WL 1903247, at *11 (N.D. Ill. May 7, 2013) (same). Similarly, although the ALJ notes that Bjorge's medical records contain "normal neurological findings" (AR 21), he failed to explain why the evidence of normal neurological examinations was inconsistent with her extensive history of frequent, severe migraines and her subjective complaints of continuing, debilitating pain. *See Wessel v. Colvin*, No. 4:14-cv-00055, 2015 WL 5036775, at * 6 (S.D. Ind. Aug. 4, 2015) ("the ALJ cited no expert opinion that the normal neurologic examinations meant that [claimant] does not truly experience the number or severity of migraines she reported")). Therefore, the Commissioner's attempts on this issue are unavailing.

Finally, the Commissioner contends that the restrictions in the RFC are appropriate given Bjorge's efforts to complete an associate's degree in business management and her ability to perform activities of daily living. In response, Bjorge argues that the ALJ erred by improperly relying on these activities to undercut her allegations of disabling limitations without properly evaluating her symptoms as required by SSR 16-3p. When evaluating a claimant's subjective symptom allegations under SSR 16-3p, "an ALJ assesses the objective medical evidence and several other factors, including the claimant's daily activities, effectiveness and side effects of any medication, treatment, other methods to alleviate symptoms, and factors that precipitate and aggravate pain." *Angie S. v. Kijakazi*, No. 21C5978, 2022 WL 17093363 at *7 (N.D. Ill. Nov. 21, 2022) (citing SSR 16-3p, 2017 WL 5180304, at * 5, *7-8 (Oct. 25, 2017); 20 C.F.R. § 404.1529(c)). "Although it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, this must be done with care." *Roddy*, 705 F.3d at 639. The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Id.*; *see also Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (citations omitted). In particular, when reviewing a disability claim concerning migraines, any "assessment of a claimant's daily activities should take into account how her activities may vary between her good days and her bad days." *Gould v. Kijakazi*, No. 21-CV-308, 2022 WL 541511, at *3 (E.D. Wis. Feb. 23, 2022).

Here, the ALJ concluded that Ms. Bjorge's effort to attend and graduate from school with a business degree indicated that she could work full-time. (AR 21.) The ALJ added that Bjorge lives independently and is "generally able to perform basic daily activities on

17

her own." (*Id*.) However, the ALJ's conclusions ignore Bjorge's uncontroverted testimony explaining that she started taking courses in 2017, but dropped out because she was too sick to attend. (AR 43-44.) Even after she re-started coursework in 2019, she had great difficulty keeping up and needed accommodations from her instructors allowing her to turn in assignments late and take exams alone in a quiet room because she was "sick all of the time." (AR 45-46.) Bjorge also acknowledged at the hearing that she was able to engage in some physical activity, but qualified that activity "immediately" brings on a headache, requiring her to go to bed and take medication. (AR 69-70.) To the extent that Bjorge reported being able to do "some light housework" and "manage her own finances," she similarly explained that she "has to pace herself." (AR 567.) Medical records also reflect that Bjorge could do housework, but that the activity would cause "worsened migraines after a day or two." (AR 484.) Importantly, she stated that the migraines made it hard to hold a job because she often had to go home sick or in pain, which also caused her to miss "significant school time." (AR 484-85). The ALJ overlooks other evidence in the record showing that her ability to perform activities of daily living is limited to "good days" when she is not incapacitated by migraine pain. (AR 313, 315.)

      The ALJ's assumption that Bjorge's ability to perform activities of daily living while not incapacitated is particularly problematic given his failure to explain how her periodic ability to do homework or housework translates into the ability to sustain *full-time* employment. *See Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) ("This is an even more extreme example of a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work

around periods of incapacitation."). On average, Bjorge testified without any evidence to the contrary that she was sick one to three times per week, just as confirmed in her medical reports beginning in 2019. (AR 67.) Moreover, the vocational expert who testified at the hearing stated that someone routinely absent from work for even *two days per month* would be precluded from all work. (AR 79.) Yet the ALJ adopted an RFC that fails, without explanation, to include a rate of absenteeism or time spent off-task despite evidence in the record that Bjorge was still suffering debilitating migraine headaches one to three times *per week*. *See Moore*, 743 F.3d at 1126 (concluding that the ALJ erred by failing to account for the limitations caused by migraines occurring with that frequency). On remand, the ALJ must reassess Bjorge's RFC and specify why the frequency and variable severity of her migraines would not require her to lie down in a quiet, dark room to alleviate pain or impact the rate of her absenteeism if she were subject to sustained, full-time employment.

ORDER

IT IS ORDERED that:

1) The motion for summary judgment filed by the Commissioner of the Social Security Administration (dkt. #16), is DENIED, and the finding that claimant Rena Lee Bjorge is not eligible for social security disability benefits is REMANDED.

2) The clerk of court is directed to enter final judgment for plaintiff.

Entered this 21th day of November, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge